UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICIA L. WALTERICH,                              **REPORT**
                                                     **and**
                                    Plaintiff,   **RECOMMENDATION**

              v.
                                                 **06-CV-0747A(F)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                    Defendant.[1]


_____

APPEARANCES:        LAW OFFICE OF KENNETH R. HILLER
                    Attorney for Plaintiff
                    JOSEPH D. CLARK, of Counsel
                    200 Niagara Falls Boulevard
                    Amherst, New York 14228

                    TERRANCE P. FLYNN
                    United States Attorney
                    Attorney for Defendant
                    JANE B. WOLFE
                    KEVIN D. ROBINSON
                    Assistant United States Attorneys, of Counsel
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202

## JURISDICTION

       This action was referred to the undersigned by Honorable Richard J.

Arcara on May 8, 2007, for pretrial matters including report and recommendation

on dispositive motions.  The matter is presently before the court on two motions

_____

       [1] On February 12, 2007, Michael J. Astrue became Commissioner of Social Security and,
pursuant to Fed.R.Civ.P. 25 (d)(1), is substituted for his predecessor, JoAnne B. Barnhart, as the
defendant in this action.  No further action is required to continue this suit.  42 U.S.C. § 405(g)
("Any action instituted in accordance with this subsection shall survive notwithstanding any
change in the person occupying the office of Commissioner of Social Security or any vacancy in
such office").

for judgment on the pleadings filed on May 7, 2007 by Defendant (Doc. No. 7), and Plaintiff (Doc. No. 8).

## BACKGROUND

Plaintiff, Patricia L. Walterich ("Plaintiff"), seeks review of Defendant's decision denying her Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") (together, "disability benefits") under, respectively, Titles II and XVI of the Social Security Act ("the Act").  In denying Plaintiff's application for disability benefits, Defendant determined that although Plaintiff has not engaged in substantial gainful activity since December 27, 2004 and suffers from a severe condition consisting of an anxiety disorder, a panic disorder, a depressive disorder, and a personality disorder, Plaintiff does not have an impairment or a combination of impairments within the Act's definition of impairment.  (R. 24).[2]   As such, Plaintiff was found not disabled, as defined in the Act, at any time through the date of the Administrative Law Judge's decision. (R.25).

## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits on January 26, 2004, claiming a disability onset date of December 27, 2003.  (R. 57-59, 68-74)   Those

---

[2] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

applications were denied on April 5, 2004.  (R. 32-38).  Pursuant to Plaintiff's request, filed May 11, 2004 (R. 39), an administrative hearing was held before Administrative Law Judge ("ALJ") John J. Mulrooney on September 21, 2005. (R. 16).  Plaintiff, represented by Susan M. Knoll ("Ms. Knoll"), a paralegal with Client Advocacy of the Erie County Mental Health Association, appeared and testified at the hearing.  (R. 16, 310-324).  Testimony was also given by vocational expert ("VE") Julie Andrews ("Andrews").  (R. 324-331).  In his decision, dated October 14, 2005, the ALJ found Plaintiff was not disabled.  (R. 26).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 25, 2006. (R. 4).  This action followed on November 13, 2006.

Defendant's answer to the Complaint, filed on February 2, 2007, (Doc. No. 3), was accompanied by the record of administrative proceedings.  On May 7, 2007, motions for judgment on the pleadings were filed by Defendant (Doc. No. 7) ("Defendant's motion"), accompanied by a Memorandum of Law (Doc. No. 7-1) ("Defendant's Memorandum"), and by Plaintiff (Doc. No. 8) ("Plaintiff's motion"), attached to which is a Memorandum of Law (Doc. No. 8-2) ("Plaintiff's Memorandum").  Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be GRANTED and the matter remanded for calculation of benefits; Defendant's motion should be DENIED.

**FACTS**

Plaintiff, Patricia L. Walterich ("Plaintiff"), born February 15, 1955, has completed one year of college.  (R. 57, 72).  Plaintiff alleges she is disabled because she suffers from a generalized anxiety disorder, panic attacks, temporomandibular ("jaw") joint disorder ("TMJ"), and irritable bowel syndrome ("IBS").  (R. 68).

Plaintiff worked as a dietary aide in nursing homes from 1990 until she was terminated on December 27, 2003 for poor attendance as a result of her disability.  (R. 69, 77, 68, 321).  In September of 2004, Plaintiff attempted to work as a kitchen helper at East Aurora High School but quit after one week because of her disability.  (R. 314-315).  Plaintiff is divorced and lives by herself in an apartment.  (R. 57, 92, 312-13, 320).

During the relevant period, Plaintiff has been treated by her primary care physician, Kevin McMahon, M.D. ("Dr. McMahon").  (R. 127-167).  On April 21, 2000, Plaintiff, who has a history of depression, was examined by Dr. McMahon who noted that Plaintiff was taking Wellbutrin (an anti-depressant), but less than the prescribed dosage because she had recently experienced a twenty pound weight-gain, and that Plaintiff described her mood as "very good."  (R. 160).  Plaintiff also had recently changed jobs, returned to college and was living with her daughter.  *Id.*  Plaintiff complained of right wrist pain she attributed to a motor vehicle accident two weeks earlier, as well as occasional migraines and right jaw pain.  *Id.*  Plaintiff had a history of diverticulitis but reported this condition was

under good control with diet.[3]  *Id.*

Plaintiff was next examined by Dr. McMahon on June 21, 2000, for recurring migraines for which Dr. McMahon prescribed Midrin (a mild sedative used to treat migraines).  (R. 159).  When Dr. McMahon next examined Plaintiff on June 8, 2000, Plaintiff reported she had sought treatment at an emergency room[4] on June 22, 2000 because the Midrin did not relieve her migraine, but that a CT scan of her head was negative.  (R. 158).  Dr. McMahon provided Plaintiff with samples of Maxalt MLT, to alleviate acute migraine attacks.  *Id.*  On June 15, 2000, Plaintiff sought treatment from Dr. McMahon for abdominal pain and diarrhea which Dr. McMahon attributed to Plaintiff's diverticulitis and prescribed antibiotics.  (R. 156).

On July 3, 2000, Plaintiff complained to Dr. McMahon of an ear infection, for which she was prescribed Amoxicillin and Tylenol Sinus.  (R. 153-54).  Dr. McMahon also reported that Plaintiff's jaw pain was controlled with Vanquish, a pain reliever, her diverticulitis was resolved, and Plaintiff took Tylenol for her headaches because she was unable to tolerate Maxalt.  *Id.*

On November 29, 2000, Plaintiff sought treatment from Dr. McMahon for left knee pain which Plaintiff had for the past ten years, but which was worsening.

---

[3] "Diverticulitis happens when pouches (diverticula) form in the wall of the colon and then get inflamed or infected."  Diverticulitis - Topic Overview, *available at* http://www.webmd.com/digestive-disorders/tc/diverticulitis-topic-overview.  Inflammation and infection can occur if bacteria becomes trapped in the pouches. *Id.*

[4] The record does not contain any treatment notes relative to Plaintiff's visit to an emergency room on June 22, 2000, nor is the emergency room further identified.

(R. 153).  Dr. McMahon recommended physical therapy, exercise and a calorie-restricted diet, and found that Plaintiff has anemia.  *Id.*  On January 5, 2001, Plaintiff was treated by Dr. McMahon for cramping and low back pain which Dr. McMahon diagnosed as a urinary tract infection for which antibiotics were prescribed.  (R. 152)

On August 1, 2001, Plaintiff was examined by Dr. McMahon for complaints of left foot pain and a ganglion cyst on her finger, for which Dr. McMahon referred Plaintiff to specialists.  (R. 151).  Plaintiff reported her mood was "very good" and that she was enjoying her job and doing well in her college courses.  *Id.*  Dr. McMahon instructed Plaintiff to continue taking her anti-depressants, including Wellbutrin, Amitriptyline, and Depakote.[5]  *Id.*

On November 28, 2001, Plaintiff saw Dr. McMahon complaining of increasing abdominal pain and nausea for which she had been to the emergency room the night before Thanksgiving,[6] where Plaintiff was prescribed antibiotics for a suspected urinary tract infection.  (R. 150).  Dr. McMahon order an abdominal and pelvic sonogram and also prescribed Levbid.[7]  *Id.*

_____

[5] The record does not indicate when the Amitriptyline and Depakote were prescribed.

[6] The court takes judicial notice that in 2001, the Thanksgiving holiday was celebrated on November 22, 2001, which implies Plaintiff sought treatment for her abdominal pain at the emergency room on November 21, 2001.  No treatment records from Plaintiff's visit to the unidentified emergency room are found in the record.

[7] Levbid is a prescription medication used to treat stomach and intestinal problems such as cramps and IBS and "works by decreasing acid production in the stomach, slowing down the natural movements of the gut, and relaxing muscles in many organs (e.g., stomach, intestines, bladder, kidney, gallbladder.)"  Drugs and Treatments - Levbid Oral, *available at* http://www.webmd.com/drugs/drug-12406-Levbid+Oral.aspx?drugid=12406&drugname=Levbid+O

On December 14, 2001, Plaintiff reported to Dr. McMahon that although she was unable to drink enough water for the sonogram procedure, her abdominal pain had resolved.  (R. 149).  Because Plaintiff had a history of fibroid uterus, Dr. McMahon scheduled Plaintiff for a CT scan of the abdomen and pelvis.  *Id*.

Upon examination by a physician's assistant, Todd Bruce ("P.A. Bruce"), on January 16, 2002, Plaintiff complained of headaches and nausea lasting three days.  (R. 148).  P.A. Bruce diagnosed migraine headache, prescribed Toradol (nonsteroidal anti-inflammatory drug indicated for short-term management of moderately severe acute pain), and Fiorinal (used to relieve tension headaches), and wrote Plainitff a note instructing Plaintiff not to work for the next three days. *Id.*

On January 31, 2002, Plaintiff was examined by Dr. McMahon as follow-up regarding her abdominal pain which Dr. McMahon diagnosed as IBS.  (R. 147).  When Plaintiff reported taking Levbid only as needed, Dr. McMahon instructed Plaintiff to take Levbid twice a day for three weeks, at which time Plaintiff would be reexamined.  *Id.*  Dr. McMahon further noted Plaintiff was following up with a specialist regarding her fibroid disease.  *Id.*

On February 20, 2002, Plaintiff saw Dr. McMahon for a follow-up of IBS and abdominal pain, which she reported was better.  (R. 146).  Plaintiff

_____

ral.

expressed anxiety over completing her school work, explaining that she returned to school only "to prove her value to her siblings" toward whom Plaintiff harbored much anger. *Id.* Plaintiff also reported some twitching in her arms which increased with stress. *Id.* Dr. McMahon's assessment included IBS, anxiety, and diffuse abdominal pain for which Bentyl (antispasmodic drug for treatment of intestinal problems including IBS) was prescribed. *Id.*

When Plaintiff was next examined by Dr. McMahon on August 12, 2002, Plaintiff reported a sudden onset of bilateral arm weakness, weakness in her neck causing her head to drop, associated numbness and tingling of the arms, some weakness and paresthesias (tingling, burning or prickling sensations occurring in the extremities) in the lower extremities, and some twitching. (R. 145). Plaintiff reported she went to the emergency room for an evaluation where an EKG and blood work were normal. *Id.* Plaintiff, who was on crutches as she was recovering from foot surgery, also reported her brother had unexpectedly died of a cerebral aneurism in March and that she was concerned with the frailty of her own life, and Dr. McMahon noted that Plaintiff was "overwhelmed by thoughts of death," although Plaintiff denied any suicidal or homicidal ideation. *Id.* Dr. McMahon diagnosed cervical radiculopathy and paresthesias, the cause of which Dr. McMahon suspected was "anxiety/depression," and ordered an MRI of Plaintiff's head and cervical spine. *Id.* Dr. McMahon also diagnosed Plaintiff with "major depression," and increased the dosage of Plaintiff's anti-depressant, Wellbutrin. *Id.* Plaintiff's other medications, including Verapamil (for migraines),

Elavil (antidepressant), Levbid and Dicyclomine (for IBS) were continued.

On September 9, 2002, Plaintiff was examined by Dr. McMahon for follow-up of fibromyalgia and depression.  (R. 144).  An MRI of Plaintiff's head showed "some tiny white vessel disease" for which Dr. McMahon recommended a daily aspirin, but no cardiovascular risk aside from family history.  *Id*.  Plaintiff was still depressed over her brother's unexpected death from an aneurysm and reported that with the increased dosage of Wellbutrin, Plaintiff felt better physically, but not mentally.  *Id.*  Because Plaintiff was recovering from surgery to remove a ganglion cyst on her foot, she was not then working and reported that she missed work and was anxious to go back in five weeks.  *Id.*  Upon examination, Dr. McMahon observed that the surgical incision on Plaintiff's left foot was healing well, with no sign of infection and good range of motion in her ankle.  *Id*.  Dr. McMahon assessed Plaintiff's fibromyalgia was stable, depression for which Plaintiff was to continue taking Wellbutrin, the MRI of Plaintiff's head revealed a mild abnormality and the MRI of Plaintiff's cervical spine showed degenerative disc disease, although Plaintiff reported her symptoms relative to her cervical spine were then stable.  *Id*.

Upon examination by P.A. Bruce on November 11, 2002, Plaintiff complained of neck pain, for which she had sought treatment at the emergency room for the prior weekend.  (R. 143).  Examination revealed cervical spasm on the right side, for which P.A. Bruce prescribed Flexeril (a muscle relaxer).  *Id.*

Plaintiff sought treatment from Dr. McMahon on November 14, 2002, in

9

connection with her cervical strain which had been bothering her for six days.  (R. 141-42).  Plaintiff reported gastroenteritis symptoms, including vomiting and diarrhea, a week earlier, for which she had sought treatment at the emergency room on November 8, 2002.  *Id*.  Plaintiff's gastroenteritis symptoms had resolved, but Plaintiff then experienced posterior neck pain, sometimes radiating down her right arm, which was not relieved by the Flexeril.  *Id*.  That week, Plaintiff had returned to work as a dietary aide at Orchard Heights, a nursing home, but reported having "issues" with her job, including an inability to get along with a supervisor, and a fear that her job was in jeopardy because of the time lost because of health concerns.  *Id.*  Upon examination, Dr. McMahon observed no neck spasm, although rotation to the left was only 50% of expected range. *Id*.  Dr. McMahon's assessment included cervical strain for which Bextra (nonsteroidal anti-inflammatory analgesic used to relieve pain, inflammation and stiffness) and Talacen (narcotic analgesic) were prescribed, which resolved Plaintiff's gastroenteritis, and IBS for which Dr. McMahon prescribed Hyoscyamine and Bentyl (both medications for IBS treatment), stressing such medications were to be used only as needed because of potential adverse interactions with Plaintiff's other medications.  *Id*.

At Plaintiff's annual physical on December 9, 2002, Plainitff reported her mood on Wellbrutin was "good".  (R. 140).  On March 28, 2003, Plaintiff was examined at Dr. McMahon's office for back pain, specifically in her shoulder blades, as well as recurring nausea and epigastric pain.  (R. 139).  Plaintiff

weighed ten pounds less than her last visit.  *Id.*

Upon examining Plaintiff on April 14, 2003, Dr. McMahon commented that Plaintiff "has had a rough go of it over the last two weeks with multiple office and ER visits for some intermittent nausea and vomiting," most of which was caused by anxiety, which was further attributed to Plaintiff's fear of being fired for missing work too often.  (R. 138).  Plaintiff mentioned she did not get along with her supervisor and some of the other employees, but got along with the nursing home residents, but was admonished by the nursing home administrators for sticking up for the patients.  *Id.*  Plaintiff also reported that her family contributes to her anxiety, explaining that while her sister, with whom Plaintiff has much conflict, is allowed to mourn for her deceased brother, Plaintiff's parents tell her "to go on" and she is not allowed to grieve.  *Id.*   Dr. McMahon observed plaintiff was in mild distress, with anxious and agitated mood, agitated affect, pressured speech, and Plaintiff rocked in her chair and paced the room.  *Id.*   Dr. McMahon diagnosed Plaintiff with generalized anxiety disorder with acute exacerbation, prescribed Lexapro (for major depressive disorder and generalized anxiety disorder) and Xanax (for generalized anxiety disorder) for breakthrough anxiety and suggested that Plaintiff not return to work for another week or two, but Plaintiff feared losing her job.  *Id.*  Dr. McMahon further assessed that Plaintiff was so disorganized that a psychiatric admission was warranted and advised Plaintiff to go to Erie County Medical Center ("ECMC") for a Comprehensive

Psychiatric Emergency Program ("CPEP") evaluation.[8]  *Id*.

On April 14, 2003, Plaintiff sought treatment at ECMC's emergency room for severe anxiety and a CPEP evaluation was performed that same day with an admitting diagnosis of a panic disorder.  (R. 107-22).  On a CPEP Interdisciplinary Patient Assessment Form, Plaintiff's history included Plaintiff's complaints of anxiety and depression for 12 years for which various medications had been prescribed, and that two deaths of family members had "drained her" and "she died inside."  (R. 108).  Plaintiff's anxiety caused her to be nauseous and to vomit and Plaintiff had missed "an extreme amount of work" because of her health concerns. *Id*.  Plaintiff described herself as "very lonely" and no one visited her, she was tearful and fearful of dying.  *Id*.  Plaintiff was afraid of going to work for fear of being fired, which was noted to be "a reality." *Id*.  Plaintiff could not sit still and had lost 18 lbs. since December.  *Id*.  Plaintiff's medications included Xanax, Reglan (heartburn medication), Flonase (allergy relief), Cipro (antibiotic), Lexapro, and Talopram.  (R. 112).  Mental status examination revealed Plaintiff was well-groomed and compliant, but unable to sit still and constantly moved during the examination.  (R. 118), Plaintiff's mood and affect were anxious, speech was rapid, and thought process was often tangential or circumstantial, but without delusions although Plaintiff experienced feelings of

---

[8] ECMC's Comprehensive Psychiatric Emergency Program ("CPEP") is a 24-hour psychiatric emergency program featuring a multi-disciplinary approach to psychiatric evaluations, with professionals from psychiatry, psychology, social work, psychiatric nursing, child mental health, chemical dependency, and community mental health. Comprehensive Psychiatric Emergency program *available at* http://161.58.103.125/medicalservices/behavoiral/cpep.asp

being singled out at work for criticism, and she reported feelings of persecution.
*Id*.  Plaintiff was assessed with increased anxiety attacks with a need to alter
coping skills.  (R. 112).  No lethality was apparent.  (R. 113).  *Id*.  After
completing the CPEP, Plaintiff was diagnosed with major depressive disorder,
panic disorder, fibromyalgia, migraines, TMJ, diverticulitis, and loss of hearing in
her left ear.  (R. 113).  Contributing factors to Plaintiff's health concerns included
the death of her brother and fear of losing her job.  *Id*.  Counseling and Klonopin
(for anxiety) were recommended as treatment.  (R. 117).

On April 18, 2003, Plaintiff saw Dr. McMahon for a follow-up of her
generalized anxiety disorder.  (R. 137).  Dr. McMahon reported that, since her
last visit on April 14, 2003, Plaintiff was doing much better was "feeling much
better, less stress, less agitated, not pacing as much according to her mom" who
accompanied her to the appointment, and noting that Plaintiff had been
evaluated by CPEP and not found to be psychotic or suicidal, but counseling had
been recommended.  *Id.*  Plaintiff was willing to go back to work the very next
day.  *Id.*   Plaintiff's medications included Xanax three times a day, which Plaintiff
avoided taking in the afternoon, even though skipping doses usually agitated
Plaintiff, and Dr. McMahon prescribed Klonopin and Lexapro, referred Plaintiff for
counseling and advised Plaintiff her generalized anxiety disorder qualified her for
a leave of absence from work.  *Id.*

Plaintiff was next examined by Dr. McMahon on May 12, 2003, with regard
to her generalized anxiety disorder and panic attacks.  (R. 136).  Plaintiff reported

she was doing much better and going to work, although she had two panic attacks over the weekend, including one at work and the other at a Mother's Day dinner, and Dr. McMahon commented Plaintiff's sister, who blamed Plaintiff for their father's recent illness, was "one of her principle [*sic*] stressors."  *Id.*  Dr. McMahon diagnosed panic disorder and advised Plaintiff to continue taking Lexapro while weaning off the Klonopin.  *Id.*  Plaintiff was in no acute distress, her mood was good, her affect was calm, her speech and thought process were normal and her insight was fair.  *Id.*

On July 14, 2003, Plaintiff was examined by Dr. McMahon for generalized anxiety disorder and reported that she was doing well on Lexapro and only taking the Klonopin once or twice a week, and was hoping to return to school.  (R. 135).  Dr. McMahon assessed generalized anxiety disorder and an upper respiratory infection for which Amoxicillin was prescribed.  *Id.*

On August 4, 2003, Plaintiff was examined by Nurse Practitioner Paula Zagrobelny ("N.P. Zagrobelny"), regarding her anxiety, Plaintiff stated she was fearful, that her legs were weak, and her appetite had decreased.  (R. 134).  Plaintiff was experiencing increasing anxiety which had become overwhelming.  *Id.*  Plaintiff reported she received a letter advising she could not be accepted to college, and stated that she felt completely overwhelmed and had been rocking, walking, and crying all day, although she was not suicidal nor homicidal.  *Id.*  Plaintiff was tearful, moved her arms and legs in a repetitive fashion, but was coherent and had fair to good insight, despite her anxiety.  *Id.*  N.P. Zagrobelny

diagnosed Plaintiff's anxiety disorder as uncontrolled, prescribed Zyprexa (bipolar and schizophrenia medication), continued Lexapro and Klonopin, and advised Plaintiff to follow up with counseling from Spectrum Human Services, a local human services agency. *Id.*

On August 11, 2003, Plaintiff visited Dr. McMahon for bilateral swelling in her legs ("pedal edema"), reporting she gained 11 lbs. in one week, her appetite had significantly increased and she felt much better since starting Zyprexa. (R. 133). Dr. McMahon attributed Plaintiff's pedal edema to the weight gain and venous insufficiency as opposed to a side effect of the new medication and advised Plaintiff to watch her diet. *Id.*

On September 15, 2003, Plaintiff was seen by N.P. Zagrobelny for a re-check of Plaintiff's anxiety. (R. 132). Plaintiff reported feeling better and had less anxiety than before starting on Zyprexa, took Klonopin only once or twice a week, but continued to have some personality conflicts at her job. *Id.* N.P. Zagrobelny noted that Plaintiff had good insight that day, yet continued to suffer from anxiety and depression. *Id.*

On November 5, 2003, Plaintiff saw Dr. McMahon for right jaw pain similar to TMJ, which she had previously experienced. (R. 131). Plaintiff took Talacen for the pain, but not every day, and had not seen a dentist, or oral surgeon, nor tried a mouth guard. *Id.* Plaintiff reported her mood was "good" with her use of Lexapro and Zyprexa. *Id*. Dr. McMahon gave Plaintiff a trial of Bextra (nonsteroidal anti-inflammatory drug), continued Talacen, referred Plaintiff to an

oral surgeon and encouraged a dental evaluation. *Id.*

Upon examination physician's assistant Robin Rasp ("P.A. Rasp") on November 10, 2003, Plaintiff reported increasing anxiety, feeling overwhelmed, and was experiencing problems at work, but she had yet to seek the previously recommended counseling. (R. 130). Plaintiff's anxiety was exacerbated when she was alone and that she had begun rocking and having panic attacks at home. *Id.* Plaintiff lacked motivation to do anything except to feed her cats, sleep, and go to work, but that even at work, anxiety prevented her from completing her tasks, including setting the tables and preparing drinks. *Id.* Zyprexa was continued, Ativan (for anxiety associated with depression) and Effexor (for major depressive, generalized anxiety, panic and social anxiety disorders) were prescribed, and Klonopin and Lexapro were discontinued. *Id.*

On November 24, 2003, Plaintiff again saw P.A. Rasp for a follow up of her anxiety and reported that she was doing well. (R. 129). Plaintiff denied suicidal or homicidal ideation, and also had acute sinusitis. *Id.* Effexor, Ativan, and Zyprexa were continued. *Id.*

On December 22, 2003, Dr. McMahon completed an Established Patient Progress Note for Plaintiff in which he reported that Plaintiff had gained weight, suffered from nausea and vomiting, had neuro-related weakness, appeared pale, had mild inflammation of the nose, and suffered from work-related anxiety. (R. 127). Sometime in January 2004, Plaintiff's employment was terminated

because Plaintiff forgot to report to work.[9]  (R. 212, 221).  In a letter dated January 12, 2004, Dr. McMahon wrote that Plaintiff had been diagnosed with generalized anxiety disorder and panic attacks and was under his care for both conditions.  (R. 125).

On January 21, 2004, Plaintiff applied for public assistance but her weekly unemployment benefits of $144 rendered her ineligible.  (R. 63-64).  On January 26, 2004, Plaintiff filed her disability benefits application claiming disability based on generalized anxiety disorder, panic attacks, TMJ, and IBS, a disability onset date of December 27, 2003,[10] and that her disabling conditions caused her to miss work, resulting in loss of employment.  (R. 57-59, 68-74).

In connection with her disability benefits application, Plaintiff was interviewed on February 25, 2004, by SSA employee D. Beljan ("Beljan"), who reported that in face-to-face observation, Plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hand(s), or writing.  (R. 66).  Beljan noted that Plaintiff was casually dressed, was "cooperative but unusual," "lifted her arms several times to shoulder height and shook them," "kept shaking her legs" while she was sitting, and "every so often, she would vibrate her limbs - said it helped with anxiety."  *Id.*

---

[9] The exact date of Plaintiff's termination of employment is not found in the record.

[10] It is not clear from the record why, despite evidence that Plaintiff experienced the effects of her impairments prior to December 23, 2004, Plaintiff does not allege an earlier disability onset date.

In further connection with her disability benefits applications, Plaintiff completed a Function Report - Adult, dated March 5, 2004.  (R. 92-102).  Plaintiff described her daily routine as eating breakfast and dinner, watching television but usually just staring into space, sleeping a lot, and "sometimes" visiting her mother.  (R. 93).  Plaintiff took care of her three cats with litter and food provided by her daughter.  *Id.*  Plaintiff explained that prior to becoming sick she could "work and keep a calm mind without anxiety attacks."  *Id.*  Plaintiff's impairments interfered with her sleep, and she reported difficulties tending to her personal needs, including grooming, maintaining she had to "force" herself to clean up when she went out.  (R. 93-94).

Plaintiff's meal preparation was limited to "easy foods, like tv dinners and cereal, sometimes veggie soup" or reheating foods prepared by her mother, such that Plaintiff did not eat as healthy as she ought to.  (R. 93-94).  Although capable of light housework, Plainitff cleaned only when necessary and her dishes sometimes were not washed for three or four days.  (R. 95, 98).  Plaintiff went outside "as little as possible" during the winter, and when she is "afraid to be alone."  (R. 95).  Plaintiff was able to walk, drive, ride in a car and on a bicycle, and possessed a valid driver's license.  *Id.*  Plaintiff reported grocery shopping only when necessary, and is capable of handling her finances, including paying bills, counting change, and handling bank accounts, although her illnesses caused her to lose employment and run out of money.  (R. 96).

Plaintiff no longer pursued her hobbies and interests, including sewing

Barbie doll clothes, stock car (NASCAR) racing, reading, and medieval re-enactments, explaining that since her illness began she "just [felt] as if everything has no sense to doing them anymore," (R. 96), and had not been able to "finish a book in weeks."  (R. 98).  Plaintiff reported limited social activities, explaining that were it not for her parents, she probably would not go out at all.  (R. 97).  Plaintiff went to her mother's home when invited, and grocery shopped once a week.  *Id.*

Plaintiff reported difficulties getting along with her two sisters, did not know her neighbors, and wished her daughters, who lived with their father, would visit more often.  (R. 97).  Since the onset of her illness, Plaintiff engaged in no social activities with the exception of occasionally attending medieval events if her daughter paid, although even then Plaintiff's desire to avoid crowds usually rendered her unable to attend.  *Id.*

Plaintiff noted that her illnesses affected her speech and hearing, explaining she sometimes talks too fast, makes no sense, and occasionally "shut out sound" when others talked to her.  (R. 97).  Plaintiff further reported her medications caused her to gain weight which made climbing stairs difficult.  *Id.* Plaintiff further reported problems paying attention because her "mind wanders." (R. 98).  Although Plaintiff can follow instructions, she has problems getting along with people of authority, most notably her landlord when she is unable to pay the lot fee for her mobile home.  *Id.*  Plaintiff reported taking long time to adjust to change which caused her temper to flare, made her "slam things" such as doors and books.  (R. 99).  She also has trouble remembering things.  *Id.*

On March 24, 2004, Plaintiff was examined by psychologist Thomas Ryan Ph.D. ("Dr. Ryan"), on a consultative basis.  (R. 168).  Plaintiff was not then receiving any mental health counseling as she was unable to afford it.  *Id*. Plaintiff reported difficulty falling asleep, increased appetite with weight gain attributable to her medication, dysphoric mood, daily crying spells, loss of interest, social withdrawal, occasional thoughts of self-harm absent any indication of intent to act on such thoughts, much worry, and panic attacks that produced trembling and breathing difficulties.  *Id.*  She reported rocking and flapping her arms when nervous, which Dr. Ryan frequently observed throughout the examination.  *Id.*  Plaintiff's medications included Zyprexa, Lorazepam (for anxiety), Effexor and Pentazocine (for moderate to severe pain relief).  (R. 169).

Dr. Ryan observe that Plaintiff was cooperative, although "her manner of relation, social skills, and presentation were adequate to poor", she "rocked constantly" throughout the interview and "often sat on her hands in an attempt not to begin flapping them."  (R. 169).  Aside from the rocking and restlessness, there was nothing unusual about Plaintiff's appearance, her speech was normal but her voice was pressured, and her thought processes were coherent and goal directed.  *Id.*  Plaintiff "generally appeared to be quite tense" and, although her mood was neutral, Dr. Ryan reported that Plaintiff described her daily mood as "lousy."  *Id.*

Dr. Ryan reported that Plaintiff's sensorium was clear, "she was oriented to person, place, and time," "she could do simple calculations," her cognitive

functioning "appeared to be in the average range," her base of information was appropriate to experience, and her judgment was fair. (R. 170). Nevertheless, Plaintiff's recent and remote memory skills were mildly impaired, and was attributed to nervousness. *Id.* During the examination, Plaintiff could only recite 4 digits forward and 4 digits backwards, and her insight was poor. *Id.* Plaintiff's attention and concentration were intact, and she could perform simple calculations, however, Plaintiff had difficulty with short-term memory, concentration and attention, as well as maintaining attention and concentration, relating with others and dealing with stress. (R. 170). Plaintiff was able to clean, do laundry, shop and manage her own money, yet had no social life aside from visiting her parents, enjoyed her cats, making clothes for Barbie dolls, watching television, listening to the radio, and reading. *Id.*

From his evaluation, Dr. Ryan concluded that Plaintiff was able to follow and understand simple directions and instructions, consistently perform simple rote tasks, was adequate in regard to decision-making, capable of learning new tasks, but would have difficulty independently performing complex tasks. (R. 170). Dr. Ryan remarked that Plaintiff had difficulty relating with others and dealing with stress, confirming that "the results of the evaluation appear to be consistent with the allegations." *Id.*

Dr. Ryan diagnosed Plaintiff with depressive disorder, not otherwise specified ("NOS"), generalized anxiety disorder, IBS and TMJ, and recommended individual psychological therapy, which Plaintiff had not yet had at

21

this point because of financial constraints, and psychiatric intervention.  (R. 171).

Because Plaintiff was not then receiving any treatment, Plaintiff's prognosis was

guarded.  *Id.*

On March 24, 2004, Plaintiff underwent an internal medical consultative

examination by Steven Dina M.D. ("Dr. Dina").  (R. 172-74).  Physical

examination was unremarkable and Plaintiff had no functional limitations.  *Id.*  Dr.

Ryan concluded that Plaintiff's problems were related to her mental health.  *Id.*

On March 28, 2004, ECMC Physician Thomas J.O. Rhee, M.D. ("Dr.

Rhee") admitted Plaintiff to the hospital for complaints of suicidal ideation, and

Plaintiff remained hospitalized until April 7, 2004.  (R. 210-28).  Upon admission,

Plaintiff's chief complaint was that she "felt like taking [her] life, and Plaintiff was

"labile,[11] irritable, displaying vague suicidal thoughts" and "in need of lethality

assessment and stabilization."  (R. 210).  Mental status examination revealed

that although Plaintiff's physical health was good, she had poor coping skills,

poor support, was "shaky and tremulous," passively cooperative but not

consistent.  *Id.*  Plaintiff's admitting diagnosis was depressive disorder NOS,

personality disorder NOS, with a Global Assessment of Functioning ("GAF")

score of 30, indicating serious impairment in communication or judgment, or

inability to function in almost all areas.[12]  *Id.*

---

[11] Labile means "unstable."  *Webster's Third New International Dictionary* 1259 (1986).

[12] The Global Assessment of Functioning (GAF) is a 100-point scale measuring "a
patient's overall level of psychological, social, and occupational functioning on a hypothetical
continuum," and is used for reporting a mental health clinician's "judgment of the individual's

While hospitalized, Plaintiff underwent a CPEP conducted on March 28, 2004 by A. Hakeem Syed, M.D. ("Dr. Syed"), registered nurse Catherine A. Pritchard ("RN Pritchard"), and a medical student ("medical student").[13]  (R. 212-226).  Plaintiff's mental history included being overly anxious, experiencing constant movement, including rocking and hand flapping, for two months and not having slept for three nights.  (R. 212, 221).  Plaintiff had performed no housework and reported "making noises like 'an animal,'" and constantly crying, (R. 212).  Plaintiff explained that she was forgetful and lost her last job in January, 2004, because she forgot she had to work.  (R. 212, 221).  Plaintiff claimed she wanted to overdose on her pain medication, and spend her days either sitting in front of the television or in bed.  (R. 212).  Plaintiff, who had no money, lived in constant fear of being evicted from her mobile home.  (R. 212, 221).  Plaintiff complained of difficulty sleeping, decreased energy, increased appetite, an inability to take care of herself or household tasks, feeling lonely and isolated from her family, and that anxiety about her hand flapping prevented Plaintiff from going out.  (R. 221).  It was reported that Plaintiff rocked throughout the interview and had bad hygiene.  *Id*.  Plaintiff also stated that her family refused to let her grieve for her brother who died two years earlier.  (R. 215).

A physical assessment revealed that Plaintiff had a urinary tract infection

---

overall level of functioning and carrying out activities of daily living."  Axis V: Global Assessment of Functioning Scale, *available at* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[13] The medical student's signature appears at R. 223, but is illegible.

("UTI"), a stabbing pain in her stomach lasting about three weeks, shortness of breath caused by anxiety, and IBS.  (R. 216, 217).

A mental status examination at ECMC revealed that Plaintiff was alert, cooperative, and maintained good eye contact, however, her hygiene was poor, she exhibited "psychomotor agitation via rocking her body," her mood was sad, her affect was labile and inappropriate, and speech was pressured.  (R.221). Plaintiff's thoughts were tangential with some loosening of associations.  *Id*. Insight and judgment were assessed as "poor/good."  *Id*.

Plaintiff reported having contemplated suicide three times in the previous two weeks, planning to overdose on her pain medication, and actually making one attempt, but decided not to go through with it when she realized she would have to cut or crush the large pills.  (R. 222).  Plaintiff placed a call to crisis services and two calls to her daughter.  *Id*.

In the Psychiatrist's Summation portion of the CPEP, it was reported that Plaintiff was "cooperative but tearful" during the CPEP, appearing "as being odd" with inappropriate affect, felt depressed for three weeks with "neurovegetative symptoms" and "significant anhedonia"[14] with multiple financial [and] psycho-social stressors," such that Plaintiff posed "a significant risk of self harm."  (R. 222).  Plaintiff was diagnosed with Major Depressive Disorder, Anxiety Disorder, Personality Disorder, IBS, with poor psychosocial skills, and a GAF of 21-30. *Id*.

---

[14] Anhedonia refers to a condition in which one is incapable of experiencing happiness. *Webster's Third New International Dictionary* 84 (1986).

24

Upon discharge on April 7, 2004, Dr. Rhee completed Plaintiff's Discharge Summary, reporting that during Plaintiff's hospitalization she participated in group therapy, occupational therapy, and recreational therapy, all of which were concentrated on lethality assessment and dealing with depression.  (R. 211). Plaintiff was also given Effexor, and after lethality assessments, Plaintiff was "found to be free from any acute destructive urge or thoughts and no suggestion of any psychosis was found, Plaintiff was "fairly cooperative and compliant with floor routines," was "no long in any acute danger," and had gained good insight. *Id.*  Dr. Rhee's discharge diagnoses included depressive disorder NOS, personality disorder NOS, moderately impaired psychomotor skills, and a GAF of 60.  (R. 211).  Plaintiff was instructed to continue taking her medications and was referred to Spectrum Human Services ("Spectrum") for counseling.  (R. 210-211).

The day after being discharged from ECMC, April 8, 2004, Plaintiff went to Spectrum for counseling where, under the supervision of psychiatrist Meliton Tanhehco, M.D. ("Dr. Tanhehco"), Plaintiff was initially seen by Spectrum registered nurse and counselor Kathleen McCadden ("Nurse McCadden"), who noted that Plaintiff identified the death of her brother two years earlier and her loss of employment four months earlier, as causing her increased anxiety and depression.  (R. 249-50).  Plaintiff had moderate progress in symptom and problem resolution, yet her "functioning" remained "unstable."  (R. 249-50). Plaintiff continued to see, under Dr. Tanhehco's supervision, either Nurse McCadden or another Spectrum counselor for individual counseling on a weekly

to monthly basis until May 3, 2005.  (R. 229).

In particular, on April 16, 2004, Nurse McCadden observed Plaintiff was "highly anxious" and "back to rocking a lot," which Plaintiff claimed she was unable to control.  (R. 251-52).  Nurse McCadden reported Plaintiff's progress as moderate and functioning as unstable.  (R. 251-52).  On April 28, 2004, Nurse McCadden commented that Plaintiff was very anxious, had difficulty concentrating and paying attention, was worried about her finances, and assessed Plaintiff's progress as minimal and functioning remained unstable.  (R. 253-54).  When Plaintiff saw Nurse McCadden on May 11, 2004, Plaintiff reported she had one week where she "felt considerably less anxious," but was unable to sleep the past two nights because she was worried about her financial situation and was "too afraid alone."  (R. 255-56).  Plaintiff's progress was moderate but her functioning was improving.  (R. 256).

According to a Comprehensive Treatment Plan ("Comprehensive Treatment Plan") prepared on May 28, 2004, by Nurse McCadden, and confirmed by McCadden's supervisor, S. Cox, C.S.W., with Dr. Tanhehco's approval, Plaintiff was assessed as having disturbance of emotional control, with moderate functioning problems as to self care, and severe functioning problems as to Plaintiff's ability to function socially, activities of daily living, economic self-sufficiency, adaptation to change, and ability to concentrate and task performance.  (R. 241-42).  Plaintiff's prognosis was assessed as "low" with regard to motivation to change, and ability to develop new skills and support, and

"severe" as to obstacles blocking change.  (R. 243).  Plaintiff had some current skills and support for change, and her general prognosis was fair.  *Id*.  Plaintiff was diagnosed with generalized anxiety disorder ("GAD"), and depressive disorder NOS.  *Id*.

On June 9, 2004, Nurse McCadden reported Plaintiff acknowledged that she was dependent on her parents, wanted to end this dependency, and continued to struggle with the same stressors.  (R. 257-58).  Progress was moderate with improving functioning.  (R. 258).  On July 14, 2004, Nurse McCadden reported Plaintiff continued to improve and contemplated "applying for jobs," not because Plaintiff felt ready to work, but because Plaintiff needed money to pay her bills and had no money for the lot's monthly rent.  (R. 259-60). Plaintiff's progress was moderate with improving functioning according to Nurse McCadden.  (R. 260).  On August 23, 2004, Nurse McCadden reported that Plaintiff was doing much better and noticed an increase in her verbal, animation, and activity levels.  (R. 263-64).  Plaintiff stated she felt ready to work and would like to have two jobs to pay her bills, although Nurse McCadden commented Plaintiff was motivated "somewhat by being behind on her bills" and encouraged Plaintiff to "start slowly."  (R. 264).  Progress was moderate with improving functioning.  *Id*.

Plaintiff's Comprehensive Treatment Plan was updated by Nurse McCadden on August 28, 2004.  (R. 245-46).  Plaintiff was assessed as having disturbance of emotional control, with moderate functioning problems as to self

care, social functioning, activities of daily living, and ability to concentrate/task performance, and severe functioning problems as to economic self-sufficiency, and adaptation to change.  *Id*.

On September 21, 2004, Nurse McCadden reported Plaintiff had obtained and lost a job within a few days because she was "too slow" and was very worried about her finances.  (R. 265-66).  Plaintiff's functioning remained stable with moderate progress.  *Id*.  There are no notes in the record from Plaintiff's October 26, 2004 counseling session with Nurse McCadden.  (R. 267-68).

Plaintiff's Comprehensive Treatment Plan was again updated by Nurse McCadden on November 28, 2004.  (R. 247-48).  Plaintiff was assessed as having disturbance of emotional control, with moderate functioning problems as to self care, social functioning, activities of daily living, and ability to concentrate/task performance, and severe functioning problems as to economic self-sufficiency, and adaptation to change.  *Id*.

On December 8, 2004, Nurse McCadden reported Plaintiff was doing "OK but unable to feel good" because of worry over her finances and housing situation, and had decided to move out of her mobile home, and described Plaintiff's progress as moderate with improving functioning.  (R. 269-270).  On January 4, 2005, Nurse McCadden reported Plaintiff had frequent and continuous muscle spasms, and that her financial situation continues to cause her anxiety, especially the decision to sell her mobile home.  (R. 271-72).  Nurse McCadden noted that Plaintiff's progress was minimal, but her functioning

remained stable.  (R. 272).

On February 1, 2005, Nurse McCadden reported Plaintiff was "very discouraged" and "fe[lt] like giving up."  (R. 273-274).  Plaintiff again had suicidal thoughts but Plaintiff denied any intent to follow through and her anxiety continued to revolve around her financial stressors and the fear of losing her home.  (R. 274).  Progress was minimal and functioning remained stable.  *Id.*  On March 1, 2005,  Nurse McCadden reported Plaintiff had "very bad" panic attacks two weeks prior to the counseling session, that she felt as if everything was closing in on her, and was specifically concerned with having no money to pay bills or being able to obtain employment.  (R. 275-76).  Plaintiff admitted having passive suicidal thoughts with no intention of acting on them.  (R. 276).  Plaintiff's progress was noted as moderate and her functioning remained stable.  *Id.*

At Plaintiff's next scheduled Spectrum counseling session on May 3, 2005, Plaintiff was evaluated by Spectrum Counselor Linda Lamparelli ("Counsellor Lamparelli").  (R. 277-78).  Counsellor Lamparelli reported Plaintiff was "always anxious" and "very preoccupied" with her lack of finances, which was Plaintiff's main stressor at that time.  (R. 278).  Plaintiff exhibited some paranoia regarding her family members and Plaintiff's speech was somewhat pressured and tangential, such that it was difficult to keep Plaintiff focused on the topic being discussed, and Plaintiff also was ambivalent about moving from her trailer to an apartment.  *Id.*  Counselor Lamparelli assessed that Plaintiff's progress was minimal and functioning remained unstable.  *Id.*

29

On May 27, 2005, Dr. Tanhehco of Spectrum completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff, based on treatment and progress notes prepared during Plaintiff's counseling sessions with Nurse McCadden and Counselor Lamparelli.  (R. 239-40).  Dr. Tanhehco rated as "good" Plaintiff's ability to remember locations and work-like procedures, understand and carry out remember short, simple instructions, and make simple work-related decisions.  (R. 239).  Rated as "fair" by Dr. Tanhehco were Plaintiff's ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, sustain an ordinary routine without special supervision, and  work with or near others without being distracted by them.  *Id*.  Rated as "poor" were Plaintiff's ability to perform activities within a schedule, maintain regular attendance and be punctual.  *Id*. Plaintiff's ability to complete a normal workday or workweek was rated as both "fair" and "poor" and her ability to perform at a consistent pace was not rated.  *Id*.

Plaintiff's impairments also affected her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.  (R. 240).  In particular, Dr. Tanhehco rated as "good" Plaintiff's ability to adhere to basis standards of neatness and cleanliness, and to be aware of normal hazards and take appropriate precautions.  *Id*.  Rated as "fair" were Plaintiff's ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers, maintain socially appropriate behavior, respond appropriately to changes in the

work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. *Id*. Rated as "poor" was Plaintiff's ability to interact appropriately with the public. *Id*. Dr. Tanhehco commented that it is "very difficult for client to be in public places without [a] family member." *Id.*

On June 13, 2005, Dr. Tanhehco completed two Psychiatric Evaluations of Plaintiff regarding her Anxiety and Affective Disorders. (R. 230-34, 235-38). With regard to Plaintiff's anxiety disorder, Dr. Tanhehco reported that Plaintiff had depressive disorder secondary to generalized anxiety disorder, assessing Plaintiff's psychosocial and environmental problems as "moderate to severe," and that Plaintiff is "psychiatrically disabled." (R. 230). In evaluating the symptoms of Plaintiff's anxiety related disorders, Dr. Tanhehco indicated that Plaintiff had continuous severe generalized anxiety disorder and feelings of being "keyed up or on edge." (R. 231). Intermittently, Plaintiff had moderate symptoms of motor tension, restlessness and difficulty in thinking, and mild symptoms of autonomic hyperactivity, vigilance and scanning, and "mind going blank." *Id*. Plaintiff's panic attacks were intermittently accompanied by moderate symptoms of fear of dying, feelings of dizziness, unsteadiness, lightheadedness, or faintness, fear of losing control or "going crazy," intense fear, discomfort or apprehension, palpitations, pounding heart, accelerated heart rate, sweating, trembling, shaking and shortness of breath, smothering or choking. *Id.* According to Dr. Tanhehco, Plaintiff does not experience as a source of marked

distress either recurrent obsessions or compulsions, or recurrent and intrusive recollections of a traumatic experience.  (R. 231, 232).

In evaluating Plaintiff's functional limitations caused by anxiety-related disorders, Dr. Tanhehco indicated that Plaintiff intermittently experienced moderate difficulties with regard to several activities of daily living, including grooming, cleaning, paying bills, initiating and participating in activities independent of supervision or direction.  (R.233).  As for social functioning, Plaintiff intermittently had mild difficulties getting along with friends, cooperating with others and responding without fears to strangers and moderate difficulties getting along with family and strangers, showing consideration of others, displaying awareness of others' feelings, cooperating with others, and establishing interpersonal relationships.  *Id*.  Plaintiff continuously had moderate difficulties communicating clearly and effectively, exhibiting social maturity, responding to supervision and to those in authority, holding a job, interacting and actively participating in group activities, and initiating social contacts.  *Id*.

With regard to Plaintiff's task performance difficulties, Dr. Tanhehco assessed Plaintiff continuously exhibited moderate difficulties in independent functioning (requiring much support and assistance), concentration, persistence in tasks and ability to complete tasks in a timely manner, and severe difficulties relating to her ability to assume increased mental demands associated with competitive work.  (R. 234).  Also, in stressful situations, Plaintiff continuously exhibited deterioration of higher level of functioning, inability to cope with

schedules, poor decision making, and inability to adapt to changing demands, and intermittently exhibited withdrawal from situations, exacerbation of symptoms of illness, and poor attendance.  *Id.*  Dr. Tanhehco opined that Plaintiff's anxiety impairment had lasted or was expected to last for a continuous period of not less than twelve months.  *Id.*

On the Psychiatric Evaluation Dr. Tanhehco completed relative to Plaintiff's Affective Disorders, Dr. Tanhehco reported that Plaintiff had depressive disorder secondary to general anxiety disorder, assessing Plaintiff's psychosocial and environmental problems as "moderate to severe," and that Plaintiff is "psychiatrically disabled."  (R. 235-238).  Plaintiff continuously experienced moderate feelings of guilt and moderate difficulty thinking, and intermittently experienced moderately decreased energy and difficulty concentration.  (R. 236).  As to Plaintiff's manic syndrome, Dr. Tanhehco found Plaintiff continuously exhibited moderate pressure of speech and flight of ideas, and intermittently exhibited moderate hyperactivity and easy distractability.  *Id.*  Plaintiff exhibited no history of bipolar syndrome.  *Id.*

In evaluating Plaintiff's functional limitations caused by affective disorders, Dr. Tanhehco indicated that Plaintiff intermittently experienced moderate difficulties with regard to several activities of daily living, including grooming, cleaning, paying bills and initiating and participating in activities of supervision or direction.  (R. 237).  With regard to social functioning, Plaintiff intermittently experienced mild difficulties getting along with friends, moderate difficulties

getting along with family and strangers, showing consideration of others, displaying awareness of others' feelings, and establishing interpersonal relationships. *Id*. Plaintiff continuously experienced mild difficulties exhibiting social maturity, and moderate difficulties communicating clearly and effectively, responding to supervision and to those in authority, holding a job, interacting and actively participating in group activities, and initiating social contacts. *Id*.

With regard to Plaintiff's task performance difficulties, Dr. Tanhehco assessed Plaintiff continuously exhibited moderate difficulties in independent functioning (requiring much support and assistance), concentration, persistence in tasks and ability to complete tasks in a timely manner, and severe difficulties relating to her ability to assume increased mental demands associated with competitive work. (R. 238). Also, in stressful situations, Plaintiff continuously exhibited deterioration of higher level of functioning, inability to cope with schedules, poor decision making, inability to adapt to changing demands, and Plaintiff intermittently exhibited withdrawal from situations, exacerbation of symptoms of illness and poor attendance. *Id*. Dr. Tanhehco noted that Plaintiff had experienced repeated episodes of decompensation, including two hospitalizations at ECMC for severe anxiety and moderate depression, and that Plaintiff's impairment had or was expected to last for a continuous period of not less than 12 months. *Id*. On both Psychiatric Evaluations Dr. Tanhehco assessed Plaintiff's current GAF at 55, indicating moderate symptoms or difficulties in social, occupational or school functioning. (R. 230, 235).

On June 14, 2005, Plaintiff, accompanied by her daughter, Jamie, attended a counseling session with Counselor Lamparelli, who commented that "some co-dependency is apparent."  (R. 294-95).  Plaintiff reported that she was depressed about her finances as she was able to sell her trailer for only $1000, was moving into an apartment in two weeks, and Plaintiff's daughter was unable to help much financially.  (R. 295).  Plaintiff stated that although she would like to work full-time, many obstacles preventing her from doing so.  *Id.*  According to Counselor Lamparelli, at that time Plaintiff's progress was minimal and her functioning remained unstable.  *Id*.

When Plaintiff saw Nurse McCadden for her counseling session on July 12, 2005, Plaintiff reported the previous weekend she had euthanized her three cats because she knew she could not afford to care for them, felt very guilty about it, and was very tearful.  (R. 296-297).  Plaintiff reported that even prior to that decision she had been experiencing an increase in her depression, had been crying a lot and feared being alone.  *Id.*   Plaintiff's progress was found to be moderate but her functioning was deteriorating.  *Id.*

On July 26, 2005, Plaintiff told Nurse McCadden that she had been sleeping better and was beginning to like her new apartment, although she still felt very guilty for putting her cats to "sleep."  (R. 298-299).  Although Plaintiff's objective mood "appear[ed] somewhat improved," Plaintiff's progress was only minimal but her function was improving.  (R. 299).

On September 21, 2005, Plaintiff, then represented by Ms. Knoll,

participated in an administrative hearing before the ALJ.  (R. 309).  Plaintiff

testified that since December 27, 2003, she had only worked outside of her

house for one week in September of 2004, when she accepted a position the in

dietary unit at East Aurora High School where her responsibilities consisted of

preparing sandwiches for the children.  (R. 314-315).  Although she liked the job,

Plaintiff "couldn't handle it," explaining "[i]t was to early to go back [to work]" and

that "my body at the time can't catch up with my mind.  My mind goes faster than

my body."  (R. 315).  As such, Plaintiff left the dietary unit position after one

week.  *Id*.  Plaintiff testified that her health conditions prevent her from working

because she is unable to leave her apartment, being outside of her home made

her nervous, she avoids large crowds and experiences panic attacks "just going

down to get [her] mail."  *Id.*  Plaintiff explained that she does what she calls

"flying, rocking, flaying [*sic*] arms, eating, just sitting."  *Id.*  According to Plaintiff,

her panic attacks had increased from two times a month to two or three times a

week.  (R. 316).

Plaintiff testified that she can perform basic household chores and that

she "forces" herself to go grocery shopping even though she prefers not to go.

(R. 317-318).  Plaintiff reads "all kinds of books" and magazines and

newspapers, and that she watches television "constantly," and has "very many

hobbies" but that she does not do them anymore.  (R. 318-19).

Plaintiff testified that she was depressed prior to her brother's death in

2002 but after that she "just started falling apart."  (R. 321).  Just prior to the

hearing, Plaintiff's doctor (unidentified) had increased one of her medications because her condition began to worsen with return of symptoms including "the rocking, my flying, flailing the arms, and thoughts of dread come over me."  (R. 322).  Plaintiff also stated that instead of going out, she sat at home eating, watching television sleeping and doing word search puzzles.  *Id*.  At the time of her brother's death, Plaintiff, who only had two academic courses left to complete her degree, but dropped out of college because she was unable to concentrate and could not sit through classes.[15]  (R. 324).  She described her illness as a "nervous condition" for which she has been seeking treatment in the form of monthly visits to the psychiatrist and medication since 2002.  *Id.*

Plaintiff reported that she enjoys working with the elderly and would like to go back to work but that her condition prevents her from doing so, stating, "I would like to go back to work in a sense, but I would need somebody to be there to tell them I can do the work, it's just my body and nerves don't want to." (R. 324).  As to part-time work, Plaintiff testified that her impairments cause her to call in sick, which prevents her from holding a job.  *Id.*

Testimony was taken from vocational expert Julie Andrews ("Ms. Andrews").  (R. 324-329).  The ALJ asked Ms. Andrews to assume a hypothetical individual with Plaintiff's past education, training, and work experience, who has the following limitations: "is limited to simple, routine, repetitive tasks not

---

[15] The record indicates that Plaintiff did not return to college for the Fall 2003 semester. (R. 134).

performed in a fast-paced production environment involving only simple work-related decisions, and in general relatively few workplace changes," "is limited to jobs which require no more than occasional interaction with supervisors and coworkers" and no substantive interaction with members of the general public, and "is limited to occupations that require no more than occasional travel or use of public transportation beyond commuting to and from work."  (R. 326).  Ms. Andrews concluded that such an individual could not return to her previous employment but could hold positions as either a laundry laborer or an industrial cleaner, and both positions exist regionally and nationally in sufficient numbers.  *Id.*

Ms. Knoll, Plaintiff's representative, asked Ms. Andrew's to add further limitations to the hypothetical, including assuming that the hypothetical individual had irregular attendance, "missing perhaps one to two days a week," and that she needed more breaks throughout the day than is customarily allowed because of her anxiety and panic attacks.  (R. 328-329).  Ms. Andrews testified that such an individual might get hired for one of the positions discussed, but would not be able to maintain any position for any period of time.  (R. 329).

In the hearing decision issued on October 14, 2005, the ALJ found Plaintiff had anxiety, panic, depressive and personality disorder none of which, although severe, either singly or in combination, rendered Plaintiff disabled.  (R. 24).  In reaching this determination, the ALJ found Plaintiff's subjective complaints of limitations posed by her mental impairments not entirely credible because they

were inconsistent with Plaintiff's activities of daily living and other evidence in the

record, and also declined to give controlling weight to the opinion of Dr.

Tanhehco, Plaintiff's treating physician, explaining that such opinion was not

"'well-supported' by 'medically acceptable' clinical and laboratory diagnostic

techniques," and was "'not inconsistent' with the other 'substantial evidence' in

the claimant's case record."  (R. 22, 25).  The ALJ concluded "[a]fter reviewing all

of the evidence of record, it is determined that claimant's impairments do not

meet or equal any of the criteria set forth in Listing 12.00 Mental Disorders, or

any of the other listed impairments" and that "[i]n reaching this conclusion,

consideration has been given to the opinion of the State agency medical

consultant who evaluated this issue and reached the same conclusion."  (R. 19

(referring to Psychiatric Review Technique completed on April 5, 2004 by DSS

physician George J. Burnett, M.D., based on a review of Plaintiff's medical

records (R. 175-92)).  The ALJ noted specifically that the evidence "does not

establish a marked restriction of activities of daily living, marked difficulties in

maintaining social functioning, marked difficulties in maintaining concentration,

persistence or pace, or repeated episodes of decompensation, each of extended

duration as defined in Listing 12.00."  (R. 19).  In making this determination the

ALJ specifically relied on Dr. Tanhehco's rating of Plaintiff's GAF score as 55,

indicating moderate symptoms or difficulties in social, occupational or school

functioning.  (R. 19).

## DISCUSSION

**I.      Disability Determination Under the Social Security Act.**

An individual is entitled to disability insurance benefits under the Social

Security Act if the individual is unable

> …to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to
> result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months… An individual shall be
> determined to be under a disability only if his physical or mental
> impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work
> which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) &

1382c(a)(3)(C)(I).

Once the claimant proves that he is severely impaired and is unable to perform

any past relevant work, the burden shifts to the Commissioner to prove that there

is alternative employment in the national economy suitable to the claimant.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). "In assessing the disability,

the Commissioner must make a thorough inquiry into the claimant's condition

and must be mindful that 'the Social Security Act is a remedial statute, to be

broadly construed and liberally applied.'" *Monguer v. Heckler*, 722 F.2d 1033,

1037 (2d Cir. 1983) (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir.

1972)). *See also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) (" The

Social Security Act is a remedial statute, to be broadly construed and liberally

applied.") (internal quotation omitted). As such, "a claimant need not be an

invalid" to qualify as disabled under the Act.  *Williams*, 859 F.2d at 260.

### A.      Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings

regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the

administrative judge's findings are supported by substantial evidence.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires

enough evidence that a reasonable person would "accept as adequate to support

a conclusion."  *Consolidated Edison Co. v. National Labor Relations Board*, 305

U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must

consider "objective medical facts, diagnoses or medical opinions based on these

facts, subjective evidence of pain or disability (testified to by the claimant and

others), and…educational background, age and work experience."  *Dumas v.*

*Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d

122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by

medically acceptable techniques and result from frequent examinations, and the

opinion supports the administrative record, the treating physician's opinion will be

given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20

C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).  Further, in determining whether a

claimant is disabled, the ALJ is required to address multiple impairments in

combination and to consider their cumulative effect as well as the combined effects of nonsevere impairments.  20 C.F.R. § 404.1523; *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) (the SSA must evaluate the "combined impact [of a claimant's impairments] on a claimant's ability to work, regardless of whether every impairment is severe"); *Koseck v. Secretary of Health and Human Services*, 865 F.Supp. 1000, 1010 (W.D.N.Y. 1994) (citing cases).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas v. Schweiker*, 712 F.2d at 1550; 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3).  "Congress has instructed…that the factual findings of the Commissioner, if supported by substantial evidence shall be conclusive."  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520, 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine whether the applicant has a severe impairment, which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c),

416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity.  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the applicant can still perform work he has done in the past, the applicant will be denied disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry*, 675 F.2d at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work").  If the Commissioner finds that the applicant cannot perform any other

work, the applicant is considered disabled and eligible for disability benefits.  *Id.*
The applicant bears the burden of proof as to the first four steps, while the
Commissioner bears the burden of proof on the final step relating to other
employment.  *Berry*, 675 F.2d at 467.  In reviewing the administrative findings,
the court must follow this five-step analysis to determine if there was substantial
evidence on which the Commissioner based her decision.  *Butts v. Barnhart*, 388
F.3d 377, 380-81 (2d Cir. 2004).

### B.      Substantial Gainful Activity

The first inquiry is to determine whether the applicant is engaged in
substantial gainful activity.  "Substantial gainful activity" is defined as "work that
involves doing significant and productive physical or mental duties and is done
for pay or profit."  20 C.F.R. §§ 404.1510 and 416.910.

In the present case the ALJ concluded that Plaintiff did not engage in any
substantial gainful activity since December 27, 2003, the alleged onset date of
her disability.  (R. 17).  This finding is not disputed.

### C.      Severe Physical or Mental Impairment

The next step of the analysis is to determine whether the applicant had a
severe physical or mental impairment significantly limiting her ability to do "basic
work activities."  "Basic work activities" are defined as "the abilities and aptitudes
necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work

activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that the medical evidence shows that Plaintiff suffered from severe impairments consisting of an anxiety disorder, a panic disorder, a depressive disorder, and a personality disorder.  (R. 17)  He determined that "these impairments are not slight and have more than a minimal effect on the claimant's residual functional capacity" and thus "they are 'severe' as set forth in Social Security Ruling 85-28.  *Id.*  The ALJ also determined that Plaintiff suffers from physical impairments consisting of TMJ dysfunction, IBS, diverticulitis, ovarian cyst, residuals of a cholecystectomy and left ear surgery, residuals of a right wrist pain, degenerative disc disease of the cervical spine, and fibromyalgia with associated arthralgias.  (R. 19).  The ALJ further determined that these physical impairments "do not have more than a *de minimis* effect on the claimant's ability to perform substantial gainful activity on a sustained basis and are therefore 'non-severe.'"  *Id.*   Plaintiff does not contest this finding.

### D.   Listing of Impairments, Appendix 1

The third step is to determine whether any of a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("the Listing").  If the impairment or impairments are listed in the Appendix and the listing's durational requirements are satisfied, the impairment or impairments are considered severe enough to prevent an individual from performing any gainful activity and the individual is deemed disabled, regardless of the applicant's age, education or work experience.  20 C.F.R. § 404.1525 (a) and 416.925(a); *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled").

The relevant listing impairments in the present case include 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04 (Affective Disorders) ("§ 12.04") for Plainitff's depressive disorder, and 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.06 (Anxiety Related Disorders) ("§ 12.06"), for Plaintiff's generalized anxiety disorder.  According to § 12.04, an affective disorder is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04.  In order for an applicant to be found disabled under § 12.04 the disorder must be meet the severity levels of both subsections A and B, or subsection C.  *Id.*  To be disabled based on anxiety, the disorder must meet the criteria of both § 12.06A and B, or both § 12.06A and C. In the instant case, the record establishes that Plaintiff

meets all the criteria for disability based on anxiety, but only the initial criteria for

disability based on depression.[16]  Alternatively, consideration of Plaintiff's anxiety

and depression impairments in combination, as required, 20 C.F.R. § 404.1523;

*Koseck*, 865 F.Supp. at 1010, also establishes Plaintiff is disabled.  Because

Plaintiff meets all the criteria for disability based on anxiety, the court addresses

it first.

As relevant, disability based on anxiety requires

A.      Medically documented findings of at least one of the following:
                                          * * *
3.      Recurrent severe panic attacks manifested by a sudden
        unpredictable onset of intense apprehension, fear, terror and sense
        of impending doom occurring on the average of at least once a
        week . . . .

And

B.      Resulting in at least two of the following:
1.      Marked restrictions of activities of daily living; or
2.      Marked difficulties in maintaining social functioning; or
3.      Marked difficulties in maintaining concentration, persistence, or
        pace; or
4.      Repeated episodes of decompensation, each of extended duration

Or

C.      Resulting in complete inability to function independently outside
        area of one's home.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.06.

The record in the instant case establishes Plaintiff is disabled based on anxiety

---

[16] Although the ALJ found Plaintiff did not meet the criteria for establishing disability based
on either depression or anxiety, Plaintiff does not challenge such finding.

under the criteria set forth in § 12.06A and B(3) and (4).

As required under § 12.06A(3), that Plaintiff has suffered from recurrent severe panic attacks occurring on the average of at least once a week, is well-documented.  Specifically, Plaintiff was initially diagnosed with anxiety on August 12, 2002, when she was "overwhelmed by thoughts of death" since the unexpected death of her brother in March 2002.  (R. 145).  Plaintiff's anxiety was thought to be the cause of Plaintiff's sudden onset of bilateral arm weakness, neck weakness, numbness and tingling in her arms, weakness and paresthesias in her lower extremities, and twitching.  *Id*.  Following the CPEP evaluation Plaintiff underwent at ECMC on April 14, 2003, Plaintiff was diagnosed with panic disorder for which Klonopin was prescribed.  (R. 117).  On May 12, 2003, Plaintiff reported to Dr. McMahon having two panic attacks the prior weekend.  (R. 136).  On July 14, 2003, Plaintiff reported to Dr. McMahon she took Klonopin for anxiety attacks once or twice a week.  (R. 135).  On March 1, 2005,  Nurse McCadden reported Plaintiff had "very bad" panic attacks for which Plaintiff was unable to specify the trigger, other than "just everything closing in on me."  (R. 276).  On June 13, 2005, Dr. Tanhehco found Plaintiff continued to suffer from continuous and severe generalized persistent anxiety and feelings of being keyed up and on edge.  (R. 231).  Plaintiff testified at the administrative hearing that her panic attacks had increased from two times a month to two or three times a week.  (R. 316).  Significantly, no physician has questioned the credibility of Plaintiff's reported panic attacks.  The record thus establishes Plaintiff's panic attacks meet

the criteria under § 12.06A(3).  The record also contains sufficient evidence establishing Plaintiff meets the criteria for disability based on anxiety under § 12.06B(3) (marked difficulties in maintaining concentration, persistence, or pace) and § 12.06B(4) (repeated episodes of decompensation, each of extended duration).

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1.C(3).  The term "marked" is used "as a standard for measuring the degree of limitation, it means more than moderate but less than extreme."  20 C.F.R. Pt. 404 Subpt. P, App. 1.C.  Further, "marked" restrictions are not defined "by a specific number of tasks [Plaintiff] is able to complete, but by the nature and overall degree of interference with function."  *Id*.  In the instant case, a plethora of evidence establishes Plaintiff had "marked difficulties in maintaining concentration, persistence, or pace" as required by § 12.04B(3).

In particular, in November 2003, Plaintiff reported that anxiety at work prevented her from completing her assigned tasks at the nursing home where she was then employed, including setting tables and preparing drinks.  (R. 130). Plaintiff's employment had been terminated in January 2004, because she forgot she had to work.  (R. 69, 212, 221).  Significantly, upon examining Plaintiff on March 24, 2004, Dr. Ryan reported Plaintiff had difficulty with short-term memory, concentration and paying attention, as well as maintaining attention and

concentration, commenting that "the results of the evaluation appear to be
consistent with the allegations." (R. 168-70). Dr. Ryan also stated Plaintiff
engaged in abnormal arm waving and rocking motions during his examination,
causing him to prescribe strong anti-anxiety medications for Plaintiff. (R. 169).
Upon being admitted to ECMC on March 28, 2004 for a psychiatric
hospitalization precipitated by Plaintiff's suicide attempt, Dr. Rhee assessed
Plaintiff with a GAF of 30, indicating an inability to function in almost all areas.
(R. 210). While under the care of Dr. Tanhehco at Spectrum, Plaintiff's ability to
concentrate and task performance was initially assessed on May 28, 2004, as
severely impaired (R. 241-42), and later assessed on both August 28 and
November 28, 2004 as moderately impaired. (R. 245-46, 247-48). Relevantly,
Plaintiff's reported reason for the termination of her one week of employment at
East Aurora High School making sandwiches was that she was "too slow." (R.
255-56). On the Medical Source Statement of Ability to do Work-Related
Activities (Mental), completed on May 27, 2005 by Plaintiff's treating psychiatrist
Dr. Tanhehco rated as "fair" Plaintiff's ability to maintain attention and
concentration for extended periods of time, to sustain an ordinary routine without
special supervision and to work with or near others without being distracted by
them, but rated as "poor" Plaintiff's ability to perform activities within a schedule,
maintain regular attendance and be punctual. (R. 239). In an apparent error, Dr.
Tanhehco rated as both "fair" and "poor" Plaintiff's ability to complete a normal
workday or workweek, while Plaintiff's ability to perform at a consistent pace was

not rated.[17]  *Id*.  Furthermore, on the Psychiatric Evaluations completed on June

13, 2005, with regard to both Plaintiff's depressive and anxiety disorders, Dr.

Tanheco indicated Plaintiff had continuous moderate difficulties with independent

functioning (requiring much support and assistance), concentration, persistence

in tasks, and ability to complete tasks in a timely manner, continuous severe

difficulties with the ability to assume increased mental demands associated with

competitive work, and continuously showed deterioration of higher level of

functioning, inability to cope with schedules, poor decision making, and inability

to adapt to changing demands.  (R. 234 (anxiety), R. 238 (depressive disorder)).

The record thus sufficiently establishes that Plaintiff experienced "marked

difficulties in maintaining concentration, persistence, or pace" as required by §

12.04B(3).

Furthermore, Dr. Tanhehco indicated with regard to Plaintiff's anxiety

disorder that Plaintiff had experienced repeated episodes of decompensation, (R.

238), and that determination is supported by the record.  In particular, "[e]pisodes

of decompensation are exacerbations or temporary increases in symptoms of

signs accompanied by a loss of adaptive functioning, as manifested by difficulties

in performing activities of daily living, maintaining social relationships, or

---

[17] A review of the relevant Medical Source Statement indicates a probable error in
completing the form.  Specifically, with regard to Plaintiff's ability to "complete a normal workday or
workweek," listed on the second to last line of the list of abilities to be rated, Dr. Tanhehco
checked two boxes, including one labeled "Fair" and the other labeled "Poor."  (R. 239).  With
regard to Plaintiff's ability to "perform at a consistent pace," listed on the last line of the list of
abilities to be rated, Dr. Tanhehco failed to check any box.  *Id*.

maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P,

App. 1.C(4).  "The term repeated episodes of decompensation each of extended

duration in these listings means three episodes within 1 year, or an average of

once every 4 months, each lasting for at least 2 weeks."  *Id*.  If a claimant

experiences "more frequent episodes of shorter duration or less frequent

episodes of longer duration," a determination must be made as to whether the

"duration and functional effects of the episodes are of equal severity and may be

used to substitute for the listed finding in a determination of equivalence."  *Id*.

The record in the instant case contains sufficient evidence establishing Plaintiff

has had "repeated episodes of decompensation" as required by § 12.06B(4).

Specifically, on August 12, 2002, Plaintiff reported to Dr. McMahon that

since her brother's unexpected death from a brain aneurism, five months ealier,

she had been "overwhelmed by thoughts of death" for which Dr. McMahon

diagnosed Plaintiff with "major depression" and anxiety which Dr. McMahon

suspected was the cause of Plaintiff's sudden onset of bilateral arm weakness,

weakness in her neck causing her head to drop, associated numbness and

tingling of the arms, weakness and paresthesias in her lower extremities and

some twitching.  (R. 145).  Although Dr. McMahon increased the dosage of

Plaintiff's antidepressants, upon examining Plaintiff on September 9, 2002,

Plaintiff reported feeling better physically, but not mentally.  (R. 144).  On April

14, 2003, Dr. McMahon commented that Plaintiff "has had a rough go of it over

the last two weeks with multiple office and ER visits for some intermittent nausea

and vomiting," which Dr. McMahon attributed to anxiety and directed Plaintiff to

ECMC for a CPEP evaluation.  (R. 138).  Following Dr. McMahon's direction,

Plaintiff underwent a CPEP evaluation at ECMC, the documentation for which

establishes Plaintiff, based on increasing anxiety attacks, had missed "an

extreme amount of work," and was diagnosed with major depressive disorder

and panic disorder for which counseling and Klonopin (for anxiety) were

recommended as treatment.  (R. 117).  When Plaintiff saw Dr. McMahon in

follow-up on April 18, 2003, Dr. McMahon advised that Plaintiff's generalized

anxiety disorder qualified her for a leave of absence from work.  (R. 137).

After examining Plaintiff on May 12, and July 14, 2003, and reporting

Plaintiff's anxiety was improving, Plaintiff, on August 4, 2003 was examined by

N.P. Zagrobelny who reported Plaintiff's anxiety had increased and become

"overwhelming" since receiving a few days earlier a letter advising she had not

been accepted to college and had resumed rocking.  (R. 134-36).  N.P.

Zagrobelny diagnosed Plaintiff's anxiety disorder as "uncontrolled," and

prescribed Zyprexa (bipolar and schizophrenia medication), continued Plaintiff's

prescriptions for Lexapro and Klonopin, and again advised Plaintiff to seek

counseling at Spectrum.  (R. 134).

After showing some improvement at medical appointments on August 11,

September 15 and November 5, 2003, Plaintiff, on November 10, 2003, again

reported increased anxiety and feeling overwhelmed, that her anxiety increased

when she was home alone, she had resumed rocking, and had panic attacks at

home.  (R. 130-33).  At that time, Plaintiff was observed moving her arms and

legs in a repetitive fashion.  (R. 130).  Plaintiff's anxiety interfered with her ability

to complete her work assignments, including setting tables and preparing drinks,

and Plaintiff lacked motivations to do anything except feed her cats, sleep and go

to work.  (R. 130).  Zyprexa was continued, and Ativan (for anxiety associated

with depression) and Effexor (for major depressive, generalized anxiety, panic

and social anxiety disorders) were prescribed.  *Id*.  Upon examination by P.A.

Rasp on November 24, 2003, Plaintiff reported doing better.  (R. 129).

    Upon examination by Dr. Ryan on March 24, 2004, Plaintiff's "manner of

relation, social skills and presentation were adequate to poor," she "rocked

constantly" throughout the interview and "often sat on her hands in an attempt

not to begin flapping them."  (R. 169) (underlining added).  Dr. Ryan concluded

Plaintiff had difficulty relating with others and dealing with stress, confirmed the

results of the evaluation "appear to be consistent with the allegations," and noted

that Plaintiff's prognosis was "guarded" because Plaintiff was not receiving any

counseling.  (R. 171).

    Between March 28, and April 7, 2004, Plaintiff was admitted to ECMC for

complaints of suicidal ideation.  (R. 210-28).  Upon admittance, Plaintiff's mental

status examination revealed poor coping skills, poor support, Plaintiff was "shaky

and tremulous," passively cooperative but not consistent, and her GAF score was

30.  (R. 210).  For two months prior, Plaintiff had been overly anxious and

experiencing constant movement, including rocking and hand flapping, and had

not slept for three nights.  (R. 212, 221).  Plaintiff had performed no housework,

was "<u>making</u> <u>noises</u> <u>like</u> 'an <u>animal</u>,'" <u>and</u> <u>constantly</u> <u>crying</u>.  (R. 212) (underlining

added).  Plaintiff, who lost her job in January 2004 when she forgot to report to

work, had no money, lived in constant fear of being evicted from her home, was

unable to care for herself or her home, and was observed exhibiting

"psychomotor agitation via rocking her body."  (R. 69, 221).  Plaintiff had

contemplated suicide three times over the previous two weeks, and attempted

suicide once.  (R. 222).  The Psychiatrist's Summation portion of the CPEP

indicates that Plaintiff had felt depressed for three weeks with "neurovegetative

symptoms," "significant anhedonia" with multiple financial [and] psycho-social

stressors, and posed "a significant risk of self-harm."  (R. 222).  Upon discharge

on April 7, 2004, Plaintiff was referred to Spectrum for counseling.  (R. 210-11).

 At counseling sessions with Nurse McCadden at Spectrum on April 8, 16

and 28, 2004, Plaintiff was repeatedly found to be "highly anxious" and her

functioning was reported as "unstable."   (R.  249-54).  Although at Plaintiff's next

six Spectrum counseling sessions, Plaintiff's progress was reported as

"moderate" with "improving" or "stable" functioning, (*see* R. 256 (May 11, 2004,

258 (June 9, 2004), 260 (July 14, 2004), 264 (August 23, 2004), 266 (September

21, 2004), and 270 (December 8, 2004)), the evidence demonstrates an

exacerbation of Plaintiff's symptoms beginning January 4, 2005, when Nurse

McCadden reported Plaintiff had frequent and continuous muscle spasms with

increasing anxiety as Plaintiff contemplated selling her mobile home, and

Plaintiff's progress was assessed as minimal while her functioning remained

stable.  (R. 271-72).   By February 1, 2005, Plaintiff reported being "very

discouraged" and "fe[lt] like giving up," had suicidal thoughts, and continued

anxiety, especially with regard to her financial stressors and the fear of losing her

home.  (R. 273-74).  On March 1, 2005, Plaintiff reported "very bad" panic attacks

with no money to pay bills or any ability to obtain employment, and had passive

suicidal thoughts.  (R. 275-76).  Upon evaluation by Counselor Lamparelli on

May 3, 2005, Plaintiff was "always anxious," and "very preoccupied" with her lack

of finances, exhibiting paranoia regarding family members, with "unstable"

functioning.  (R. 277-78).  Plaintiff's functioning remained unstable at her June

14, 2005 counseling session when progress was minimal.  (R. 294-95).  At a

counseling session with Nurse McCadden on June 12, 2005, Plaintiff reported

experiencing increasing depression, crying, and fear of being alone, and her

progress was moderate with deteriorating functioning.  (R. 296-97).  On June 26,

2005, Plaintiff's objective mood "appear[ed] somewhat improved," with minimal

progress and improving functioning.  (R. 299).

 Furthermore, throughout Plaintiff's counseling sessions at Spectrum,

Plaintiff's medications included Effexor for anxiety and depression, (R. 230, 235),

and Plaintiff had serious problems functioning in the areas of economic self-

sufficiency (defined as "[c]onduct[ing] activities associated with achieving an

income (For example: work, applying for/participating in schooling/training)", and

adapting to change (defined as "[a]djust[ing] to new situations or changes in

routine,"  and moderate problems functioning in the areas of self-care, social

functioning, activities of daily living, and concentration/task completion.  (R. 241-

48).

Accordingly, the record establishes that Plaintiff experienced repeated

episodes of decompensation, each of extended duration, including as required by

§ 12.06B(4).  Alternatively, should the District Judge disagree that Plaintiff fails to

meet the criteria for disability based on anxiety, as established by § 12.06, the

record establishes that Plaintiff is disabled based on a combination of depressive

and anxiety disorders.

Specifically, the record establishes that Plaintiff meets the initial criteria for

disability based on depressive syndrome which is

>(1) . . . characterized by at least four of the following:
>(a) Anhedonia or pervasive loss of interest in almost all activities; or
>(b) Appetite disturbance with change in weight; or
>(c) Sleep disturbance; or
>(d) Psychomotor agitation or retardation; or
>(e) Decreased energy; or
>(f) Feelings of guilt or worthlessness; or
>(g) Difficulty concentrating or thinking; or
>(h) Thoughts of suicide; or
>(i) Hallucinations, delusions or paranoid thinking.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04A (" § 12.04A").[18]

In particular, on March 28, 2004, while hospitalized at ECMC, Dr. Syed reported

Plaintiff suffered from "significant anhedonia with multiple financial and psycho-

_____

[18] Because 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04A(2) pertains to disability based on
manic syndrome, a diagnosis inapplicable to Plaintiff, it is not discussed.

social stressors," (R. 222) and on April 28, 2004, Dr. McMahon reported Plaintiff

had anhedonia (R. 207), thus meeting the criteria of § 12.04A(1)(a).   Plaintiff

also experienced changes in her appetite, and subsequently her weight, causing

her to gain and lose significant amounts of weight in relatively short periods of

time.  (R. 108 (18 lb. weight loss in four months), 131-38 (establishing 31 lb.

weight gain over 6 ½ month period between April 14, 2003, and November 5,

2003), 139 (10 lb. weight loss between December 2002 and March 2003) 132

(10 lb. weight gain in one month), 133 (11 lb. weight gain in one week), 139 (10

lb. weight loss over four months)), meeting § 12.04A(1)(b)'s requirement.

Plaintiff often experienced sleeplessness as a result of her depression.  (R. 93

(stating "sometimes I am afraid to go to sleep and other times all I want to [do] is

sleep to get away from everything."), R. 207 (Dr. McMahon reporting Plaintiff has

insomnia), R. 212 (Plaintiff had not slept for three nights, yet stayed in bed all

day)), as required under § 12.04A(1)(c).

Plaintiff exhibited continuous symptoms of psychomotor agitation, which

began as twitching and progressed into constant rocking and flapping of the

arms.  (R. 66, 146, 169, 212).  During his consultative examination, Dr. Ryan

observed that Plaintiff rocked constantly during the examination and "she often

sat on her hands in an attempt not to begin flapping them" and "[w]henever she

would remove them, we would begin to see some trembling and she would

immediately place them back under herself to control them."  (R. 169).

Psychomotor agitation under § 12.04A(1)(d) is thus established.  Plaintiff also

exhibited feelings of guilt, particularly with regard to her decision to euthanize her cats (R. 298-99), as required by § 12.04A(1)(f), and difficulty concentrating and thinking (R. 234, 236, 238, 239, 241-42, 245-46, 247-48, 254, 324), as required by § 12.04A(1)(g).  Furthermore, Plaintiff reported suicidal thoughts on several occasions, including one unsuccessful attempt which resulted in Plaintiff's psychiatric hospitalization from March 28 to April 7, 2004 (R. 210, 275-76), thus meeting § 12.04A(1)(h)'s criteria.

In sum, Plaintiff's depressive syndrome more than satisfies the requirements of §12.04A with Plaintiff meeting seven of the listed criteria under § 12.04A(1) for which only four are required.

Once the criteria of § 12.04A are met, the plaintiff must also demonstrate that he has at least two of the following: (1) marked restrictions of activities of daily living; (2) marked difficulties maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.04B ("§ 12.04B").  Here, however, Plaintiff meets the criteria of § 12.04B(3) and (4), which Plaintiff's treating physicians and sources have attributed to anxiety, as discussed above, Discussion, *supra*, at 49-57, but not to depression.  As such, consideration of Plaintiff's anxiety and depressive disorders in combination establishes that Plaintiff is disabled.  20 C.F.R. § 404.1523; *Dixon*, 54 F.3d at 1031; *Koseck*, 865 F.Supp. at 1010.

As a further alternative, Plaintiff's impairments in combination also

establish Plaintiff is disabled insofar as she meets the criteria of depression under §12.04C, and the criteria under § 12.04B(4) of repeated episodes of decompensation, each of an extended duration, albeit attributed to anxiety rather than depression.  *See* 20 C.F.R. § 404.1523 (requiring combined effect of all a claimant's impairments, without regard as to whether any such impairment, by itself, would be of sufficient severity to support a finding of disabled); *Dixon*, 54 F.3d at 1031 (requiring consideration of all impairments, regardless of severity, to determine whether combined impact of all impairments, renders claimant disabled); *Koseck*, 865 F.Supp. at 1010 (in determining whether a claimant is disabled, the ALJ is required to address multiple impairments in combination and to consider their cumulative effect as well as the combined effects of nonsevere impairments).  Specifically, disability based on depressive syndrome may be demonstrated by

> "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than minimal limitation of the ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
>> (1) Repeated episodes of decompensation, each of extended duration; or
>> (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>> (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1 §12.04C ("§ 12.04C").

Here, Plaintiff's impairments meet the initial criteria of  §12.04C, given that Plaintiff's chronic depression has lasted for more than two years, has caused more than a minimal limitation on her ability to perform basic work activities, has been treated by medication and counseling, and was diagnosed with depression and put on anti-depressant medication prior to April 21, 2000.  (R. 160).  Since then, Plaintiff has been on a variety of anti-depressant medications in effort to control the disorder.  (R. 151, 160).  After being hospitalized for suicidal ideation, Plaintiff began seeing Nurse McCadden, or another Spectrum counselor for individual counseling on a monthly basis until May 3, 2005.  (R. 229).  Further, as discussed in connection with a finding of disability under § 12.04A and B, Plaintiff has experienced repeated episodes of decompensation, each of extended duration, although such episodes are more properly attributable to Plaintiff's anxiety rather than her depressive disorder.  The ALJ is, however, required to consider Plaintiff's anxiety disorder and depressive disorder in combination.  20 C.F.R. § 404.1523; *Dixon*, 54 F.3d at 1031; *Koseck*, 865 F.Supp. at 1010 (Plaintiff's medical impairments, including degenerative joint disease, alcoholism, and depression, in combination, required a finding of disabled).

Accordingly, Plaintiff is disabled insofar as she meets the Listing of Impairments criteria under § 12.06A and B (anxiety), or, alternatively, she meets the Listing of Impairments criteria under § 12.04A (depression) in combination with 12.06B (anxiety), or the criteria of § 12.04(C) (depression) in combination with 12.06B(anxiety).  As such, the matter should be remanded for calculation of

benefits.

Alternatively, the record also establishes that the ALJ committed legal error in failing to give controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Tanhehco, that Plaintiff is unable to work.  In particular, 20 C.F.R. § 404.1527(d)(2) provides that

> [g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. . . .

20 C.F.R. § 404.1527(d)(2).

*Accord*, *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d. Cir 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).  The SSA regulations specify the following factors as relevant "in determining the weight to give the [treating physician's] opinion": (1) the length of treatment, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) support afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole, and (6) the specialization of the treating physician.  20 C.F.R. §404.1527(d).  Furthermore, if the ALJ does not afford the treating physician's opinion controlling weight, he is required to adequately explain the weight he did give to the opinion.  *Id.*

In failing to give controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Tanhehco, the ALJ acknowledged that Dr. Tanhehco, who had been treating Plaintiff every one to two months for at least a year, opined that Plaintiff had severe and continuous difficulties in the areas of concentration, persistence or pace, adaptation to stress, repeated episodes of decompensation, and was psychiatrically disabled.  (R. 22).  Nevertheless , the ALJ gave little weight to the opinion of Dr. Tanhehco because "although Dr. Tanhehco indicated that the claimant was significantly limited in the areas of social functioning, concentration, persistence or pace, and adaptation to stress and that claimant was disabled, he nonetheless rated the claimant with a GAF of 55, which is indicative of only moderate symptoms."  (R. 22).  The ALJ, however, is not permitted to "rely on any test score alone.  No single piece of information taken in isolation can establish whether [a claimant has] a 'marked' or 'extreme' limitation in a domain."  20 CFR § 416.926a(e)(4)(i).  With the exception of the GAF of 55, substantial evidence in the record supports Dr. Tanhehco's opinion that Plaintiff's anxiety and depression have rendered Plaintiff unable to work.

In particular, Dr. McMahon had diagnosed Plaintiff with depression as early as April 21, 2000.  (R. 160).  That diagnosis changed to major depression on August 12, 2002, when Plaintiff reported overwhelming feelings of grief regarding the unexpected death of her brother in March, 2002 from a brain aneurysm.  (R. 145).  On November 14, 2002, Plaintiff reported to Dr. McMahon that she was having "issues" with her dietary aide job, including an inability to get

along with a supervisor, and a fear that her job was in jeopardy because of the time lost because of health concerns.  (R. 141-42).

On April 14, 2003, Dr. McMahon commented that Plaintiff, over the prior two weeks, "has had a rough go of it . . . with multiple office and ER visits for some intermittent nausea and vomiting," most of which was caused by anxiety, which was further attributed to Plaintiff's fear of being fired for missing work too often.  (R. 138).  Plaintiff had encountered problems at work with the nursing home administrators for sticking up for the patients and continued having personal problems such that Plaintiff was in mild distress, with anxious and agitated mood, agitated affect, pressured speech, and Plaintiff rocked in her chair and paced the room.  *Id.*  Generalized anxiety disorder with acute exacerbation was diagnosed, and Lexapro and Xanax were prescribed, Plaintiff was told not to return to work for one to two weeks, and a CPEP evaluation at ECMC was recommended.  *Id*.  Plaintiff underwent the CPEP on April 14, 2003, following which she was diagnosed with major depressive disorder and panic disorder.  (R. 113).  On April 18, 2003, Dr. McMahon referred Plaintiff for counseling, advising that her generalized anxiety disorder qualified her for a leave of absence from work.  (R. 137).  On May 12, 2003, Dr. McMahon reported Plaintiff had an anxiety attack at work.  (R. 136).

By August 4, 2003, Plaintiff was overwhelmed with increasing anxiety such that she was rocking, walking and crying all day, and N.P. Zagrobelny diagnosed Plaintiff's anxiety disorder as "uncontrolled."  (R. 134).  On Novembver 10, 2003,

P.A. Rasp reported Plaintiff's anxiety was exacerbated when alone and she was

having panic attacks and rocking at home.  (R. 130).  Although Plaintiff was

attending work, her anxiety prevented Plaintiff from completing her assigned

tasks, including setting tables and preparing drinks.  (R. 130).  On December 22,

2003, Dr. McMahon reported Plaintiff suffered from work-related anxiety.  (R.

127).  In January 2004, Plaintiff's employment was terminated when she forgot

she had to work.  (R. 69, 212, 221).  The results of psychologist Dr. Ryan's

consultative examination of Plaintiff on March 24, 2004, were "consistent with the

allegations," including psychomotor agitation, and difficulties with short-term

memory, concentration, attention, relating with others and dealing with stress.

(R. 168-70).  Dr. Ryan further commented that because Plaintiff was not then

receiving the recommended individual psychological therapy because of lack of

finances, her prognosis was guarded.  (R. 171).

During Plaintiff's psychiatric hospitalization at ECMC between March 28

and April 7, 2004, Plaintiff displayed suicidal ideation and reported one suicide

attempt.  (R. 210-28).  Plaintiff had poor coping skills, poor support, psychomotor

agitation, including rocking and handflapping, an admitting GAF of 30, had

performed no housework and "was making noises like an animal."  (R. 210, 212,

221).  In the Psychiatrist's Summation portion of the CPEP completed during

Plaintiff's hospitalization, Plaintiff was reported "as being odd" with inappropriate

affect, depressed with "neurovegetative symptoms," "significant anhedonia,"

posed a risk of self-harm, and was diagnosed with Major Depressive Disorder,

Anxiety Disorder, Personality Disorder, poor psychosocial skills, and a GAF of 21-30.  (R. 222).

Throughout Plaintiff's counseling sessions at Spectrum from April 8, 2004 through July 26, 2005, Plaintiff, despite some periods of improvement, was often assessed as having "unstable" or "deteriorating" functioning.  (R. 250 (April 8, 2004), 252 (April 16, 2004), 254 (April 28, 2004), 278 (May 3, 2005), 295 (June 14, 2005), and 297 (July 12, 2005)).  These findings are reflected in the Comprehensive Treatment Plan initially prepared on May 28, 2004, by Nurse McCadden and confirmed by her supervisor, S. Cox, C.S.W., with Dr. Tanhehco's approval, assessing Plaintiff with disturbance of emotional control, with moderate functioning problems as to self care, and severe functioning problems with social functioning, activities of daily living, economic self-sufficiency, adaptation to change, ability to concentrate and task performance. (R. 241-43).  In updates to the Comprehensive Treatment Plan prepared on August 29 and November 28, 2004, Plaintiff continued to be assessed as having disturbance of emotional control with moderated functioning problems as to self care, social functioning, activities of daily living, and ability to concentrate/task performance, and severe functioning problems as to economic self-sufficiency and adaptation to change.  (R. 245-26, 247-48).  It is significant that "economic self-sufficiency," as used in the Comprehensive Treatment Plan, refers to a patient's ability to "conduct[ ] activities associated with achieving an income."  (R. 242).  Furthermore, Plaintiff's unsuccessful work attempt in September 2004 is

consistent with these assessments given that Plaintiff's reported reason for the termination of her one week of employment at East Aurora High School making sandwiches was that she was "too slow."  (R. 255-56).

Accordingly, a plethora of evidence in the record supports Dr. Tanhehco's opinions that Plaintiff was psychiatrically disabled from working based on both generalized anxiety (R. 230) and depressive disorder (R. 235).  Furthermore, the evidence on which the ALJ relied in determining that Dr. Tanhehco's opinion was not entitled to controlling weight was, including Dr. Tanhehco's determination that Plaintiff's GAF was 55 and that Plaintiff's psychological impairments resulted in only moderate limitations in Plaintiff's activities of daily living are, in context, less than substantial evidence.  *See* 20 CFR § 416.926a(e)(4)(i) (providing the ALJ is not permitted to "rely on any test score alone.  No single piece of information taken in isolation can establish whether [a claimant has] a 'marked' or 'extreme' limitation in a domain.").

In particular, the ALJ stated that Plaintiff's daily living activities are only mildly limited because Plaintiff "reported that she lives alone and that her activities include caring for her own personal needs, driving, cooking simple meals on a daily basis, paying bills, handling a savings account, using a check book, and/or money orders, performing household chores such as cleaning, washing dishes, dusting, vacuuming and doing laundry, mowing the lawn, shopping, going to visit her parents, visiting with her daughters, dining out with her daughters, making dresses for Barbie dolls, constantly watching television,

listening to the radio, and reading newspapers, news magazines, books," going to her parents' house, and going to medieval festivals when her daughter pays her way.  (R. 20).  Although Plaintiff did report these activities in the Function Report for the New York State Office of Temporary and Disability Assistance Division of Disability Determinations, she also noted that she had difficulties in her abilities to care for herself, including irregular bathing and feeding herself, that she needed special help or reminders to take care of her personal needs and grooming, that she had to force herself to clean up when she went out, that she only did light housework when she felt like it or when it was needed, that she went outside as little as possible, and that she only shopped for food when needed and tried to get it done as fast as possible," which the ALJ failed to acknowledge.  (R. 94-96).

While the ALJ included "making dresses for Barbie dolls" and "going to medieval festivals when her daughter pays her way," he also ignored that Plaintiff clearly stated that since her illness began she ceased doing these hobbies because she "just [felt] as if everything has no sense to doing them anymore." (R. 20, 96).  In fact, Plaintiff reported that even when her daughter was willing to pay her way for medieval events, Plaintiff almost always refused to go as she wanted to avoid crowds.  (R. 97).  Plaintiff indicated that her social activities are limited by her illness, stating that if it was not for her parents she probably would not go out at all.  *Id*.  Plaintiff reported that the only places she frequented on a regular basis were her mother's house (when she invited) and the supermarket

(once a week).  *Id.*  Plaintiff also reported difficulties getting along with others,

including her sisters.  *Id.*  Significantly, eligibility for disability benefits is not

contingent on a claimant being rendered completely incapacitated.  *Williams*, 859

F.2d at 260 (" The Social Security Act is a remedial statute, to be broadly

construed and liberally applied . . . . [and, as such] a claimant need not be an

invalid" to qualify as disabled under the Act).  *Williams*, 859 F.2d at 260.

In his assessment of Plaintiff, Dr. Tanhehco indicated that Plaintiff had

difficulties maintaining social functioning.  (R. 233).  Specifically, it is undisputed

that Plaintiff exhibited continuous moderate difficulty communicating clearly and

effectively, exhibiting social maturity, responding to supervision, responding to

those in authority, holding a job, and interacting and actively participating in

group activities.  *Id.*  Plaintiff also intermittently exhibited moderate difficulty

getting along with family and strangers, showing consideration of others,

displaying awareness of other's feelings, cooperating with coworkers,

establishing interpersonal relationship, and initiating social contacts.  *Id.*  Plaintiff

also had mild intermittent difficulties getting along with friends, cooperating with

others, and responding without fear to strangers, and Dr. Tanhehco commented

that it would be "very difficult for client to be in public places without [a] family

member."  (R. 233, 240).

As such, Plaintiff's assertions regarding her inability to engage in such

interests are consistent with the medical opinions that Plaintiff suffered from

"anhedonia,"  (R. 207, 222), which no treating source has questioned.

Insofar as Dr. Tanhehco's determination that Plaintiff's GAF was 55 is inconsistent with the rest of the record, this single finding does not constitute substantial evidence in light of the record as a whole.  20 CFR § 416.926a(e)(4)(i).  Moreover, it is the responsibility of the ALJ to fully develop the administrative record, and this duty exists even where a claimant is represented by counsel.  *Schaal v. Apfel*, 134 F.3d, 496, 505 (2d Cir. 1996).  Such duty includes re-contacting a claimant's treating physician or psychologist if a report from the claimant's medical source "contains a conflict or ambiguity that must be resolved."  20 C.F.R. §404.1512(e); *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2nd Cir. 1998).  As such, insofar as the ALJ found Dr. Tanhehco's assessment of Plaintiff's GAF at 55 as inconsistent with Dr. Tanhehco's opinion regarding Plaintiff's inability to work, which is otherwise supported by substantial evidence in the record, the ALJ was obligated to re-contact Dr. Tanhehco to obtain an explanation for the apparent inconsistency.  That the record is devoid of any indication that the ALJ attempted such contact establishes that no such attempt was made.

Accordingly, the record establishes that Plaintiff's mental impairments have rendered her unable to work and the matter should be REMANDED for calculation of benefits.  Nevertheless, as the matter is before the court for a report and recommendation, the court considers the ALJ's determination regarding the balance of the five factors to be considered in the interest of completeness should the District Judge disagree with the initial recommendation.

### E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in this five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work.  "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity.  *Cosme v. Bowen*, 1986 WL 12118, at *3 (S.D.N.Y. Oct. 21, 1986).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a dining room attendant/waitress, and a waitress/kitchen helper.  (R. 25). This finding is undisputed.


### F.    Suitable Alternative Employment in the National Economy

Once the claimant has established that he has no past relevant work experience or cannot perform his past relevant work because of his impairments, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with the Plaintiff's residual functional capacity, age, education, and work experience.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  The claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile

("the Grids").  *Decker v. Harris*, 647 F.2d 291, 296 (2d Cir. 1981).  Further, where

a plaintiff's nonexertional limitations further significantly limit the plaintiff's ability

to work, apart for any incapacity attributed solely to exertional limitations such

that the plaintiff is unable to perform the full range of employment otherwise

indicated by the Grids, the ALJ should obtained testimony from a vocational

expert as to the impact of the nonexertional limitations.  *Bapp*, 802 F.2d at 603.

In this case, relying upon the testimony of the vocational expert and Medical-

Vocational Guidelines as a framework for his decision, the ALJ concluded that

Plaintiff was not disabled because she could perform other work in the national

economy, including medium exertion work as a laundry laborer and an industrial

cleaner, both of which exist in significant numbers regionally and nationally .  (R.

23-24, 25).

The ALJ concluded that the additional information included in the

hypothetical Plaintiff, through Ms. Knolls, posed to the vocational expert,

including that the hypothetical person's attendance was irregular, missing one to

two days a week, or needed frequent, longer, unscheduled breaks from the job

because of anxiety to permit her to walk around, (R. 328-29), which the

vocational expert responded would render the person unlikely to be able to retain

employment (R. 329), were inconsistent with the record such that the ALJ was

free to disregard the vocational expert's response to such hypothetical.  (R. 24).

Plaintiff challenges this finding.  (Plaintiff's Memorandum at 29, R. 239).  The

evidence in the record establishes the ALJ erroneously rejected the vocational

expert's opinion based on the hypothetical posed by Plaintiff's representative because substantial evidence in the record establishes that Plaintiff has severe anxiety that regularly caused her problems with work attendance and performance, limiting her capacity to work.

Specifically, in November 2003, Plaintiff reported that anxiety at work in the nursing home prevented her from completing her assigned tasks, including setting tables and preparing drinks, (R. 130), and in January 2004, such employment was terminated for poor attendance and because Plaintiff forgot she had to work.  (R. 69, 212, 221). Plaintiff's reported reason for the termination of her one week of employment at East Aurora High School making sandwiches was that she was "too slow."  (R. 255-56).  Moreover, as discussed in connection with the Listing of Impairments, significant evidence in the record establishes that Plaintiff's anxiety caused her to experience "marked difficulties in maintaining concentration, persistence, or pace."  (Discussion, *supra*, at R. 47-50).  As such, the ALJ erred in disregarding the vocational expert's response to the hypothetical posed by Plaintiff's representative that Plaintiff's condition prevented her from maintaining employment even in the types of jobs described by the vocational expert.

## **CONCLUSION**

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc.

No. 7), should be DENIED; Plaintiff's motion for judgment on the pleadings (Doc.

No. 8), should be GRANTED; and the matter should be remanded for calculation

of benefits.


Respectfully submitted,

*/s/ Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        August 27  , 2008
                   Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 27, 2008
                 Buffalo, New York